IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Case No. 1:26-cv-02248-APM

JACQUELINE R. SMITH,

Plaintiff,

v.

U.S. DEPARTMENT OF DEFENSE *et al.*,

Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

John Bussian
N.C. State Bar No. 15487
jbussian@aol.com
THE BUSSIAN LAW FIRM PLLC
150 Fayetteville Street
Suite 1700
Raleigh, NC 27601
Tel: 919.306.3319
Fax: 919.839.0304

*Pro Bono Attorney for Plaintiff*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................ III

INTRODUCTION ........................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................ 2

I. STRIPES HAS ENJOYED A PROUD HISTORY OF EDITORIAL INDEPENDENCE, THOUGH CONGRESS HAS HAD TO ACT TO ENSURE THAT INDEPENDENCE. ........................................................ 2

II. MS. SMITH IS SELECTED FOR THE JOB. ........................................................ 4

III. DEFENDANTS DO NOT RESPECT THE FREE PRESS, AND THAT LACK OF RESPECT WAS EVENTUALLY DIRECTED AT STRIPES. ........................................................ 5

A. Defendants work to undermine free press generally. ........................................................ 5

B. Defendants turn their sights on Stripes. ........................................................ 6

IV. MS. SMITH SPEAKS OUT, AND DEFENDANTS FIRE HER WITHOUT EXPLANATION. ........................................................ 9

A. The April 8 Column: A critique of Defendants that pulled no punches. ........................................................ 9

B. Defendants fire Ms. Smith less than two weeks after the April 8 Column. ........................................................ 10

C. The aftermath: Ms. Smith's termination has shaken the Stripes staff. ........................................................ 11

V. PROCEDURAL HISTORY ........................................................ 12

LEGAL STANDARD ........................................................ 12

ARGUMENT ........................................................ 13

I. MS. SMITH IS LIKELY TO SUCCEED ON THE MERITS OF HER FIRST AMENDMENT RETALIATION CLAIM. ........................................................ 13

A. The Government cannot fire one of its employees for engaging in protected speech. ........................................................ 14

B. There is no question that Ms. Smith was fired for exercising her First Amendment rights. .......... 23

C. Ms. Smith is likely to succeed on the merits of her First Amendment retaliation claim. .......... 26

II. MS. SMITH'S TERM IN HER CONGRESSIONALLY MANDATED POSITION IS LIKELY TO EXPIRE BEFORE THIS MATTER IS RESOLVED, RESULTING IN IRREPARABLE HARM. .......... 26

A. Ms. Smith's early termination from a congressionally mandated role for exercising constitutional rights constitutes extraordinary circumstances. .......... 27

B. The *Sampson* factors do not caution restraint. .......... 29

C. If Ms. Smith is not reinstated before her meritorious First Amendment claim is resolved, she will suffer irreparable harm. .......... 29

III. PUBLIC INTEREST FAVORS GRANTING RELIEF BECAUSE CONGRESS' WILL IS BEING THWARTED. .......... 30

IV. A BOND IS NOT APPROPRIATE HERE. .......... 31

CONCLUSION .......... 31

# TABLE OF AUTHORITIES

**Cases:**

*Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*,
816 F. Supp. 3d 27 (D.D.C. 2026) ........ *passim*

*Am. Bar Ass'n v. U.S. Dep't of Just.*,
783 F. Supp. 3d 236 (D.D.C. 2025) ........ *passim*

*BEG Invs., LLC v. Alberti*,
144 F. Supp. 3d 16 (D.D.C. 2015) ........ 22

*Berry v. Reagan*,
1983 WL 538 (D.D.C. Nov. 14, 1983) ........ 27

*Black Lives Matter D.C. v. Trump*,
544 F. Supp. 3d 15 (D.D.C. 2021) ........ 21

*Bond v. Floyd*,
385 U.S. 116 (1966) ........ 19

*Bowie v. Maddox*,
642 F.3d 1122 (D.C. Cir. 2011) ........ 15, 20, 21, 23

*Buchanan v. Barr*,
71 F.4th 1003 (D.C. Cir. 2023) ........ 21

*City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*,
429 U.S. 167 (1976) ........ 16, 17

*Clark v. Merit Sys. Prot. Bd.*,
361 F.3d 647 (Fed. Cir. 2004) ........ 12

*Connick v. Myers*,
461 U.S. 138 (1983) ........ 19, 20

*Dardarian et al. v. U.S. Dep't of Def. et al.*,
Case No. 1:26-CV-1965-CRC (D.D.C.) ........ 1, 5

*Dellinger v. Bessent*,
766 F. Supp. 3d 57 (D.D.C. 2025) ........ 27, 29, 30

*Endocrine Soc'y v. Fed. Trade Comm'n*,
No. CV 26-512 (JEB), 2026 WL 1257289 (D.D.C. May 7, 2026) ........ 28

*Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*,
428 F.3d 223 (6th Cir. 2005) .......... 19

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) .......... *passim*

*Givhan v. W. Line Consol. Sch. Dist.*,
439 U.S. 410 (1979) .......... 14

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) .......... 30

*Hall v. Ford*,
856 F.2d 255 (D.C. Cir. 1988) .......... 19, 21

*Houston Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) .......... 14

*Jenner & Block LLP v. U.S. Dep't of Just.*,
784 F. Supp. 3d 76 (D.D.C. 2025) .......... 30

*Johnson v. D.C.*,
___ F.4th ___, No. 24-7140, 2026 WL 2132195 (D.C. Cir. July 24, 2026) .. *passim*

*Jones v. Bernanke*,
557 F.3d 670 (D.C. Cir. 2009) .......... 22

*Jones v. Quintana*,
658 F. Supp. 2d 183 (D.D.C. 2009) .......... 16

*Jones v. Rivers*,
722 F. Supp. 771 (D.D.C. 1989) .......... 23

*Kelly v. Hegseth*,
820 F. Supp. 3d 1 (D.D.C. 2026) .......... *passim*

*Lane v. Franks*,
573 U.S. 228 (2014) .......... 14

*LeFande v. District of Columbia*,
613 F.3d 1155 (D.C. Cir. 2010) .......... 14, 19, 23

*Mahmoud v. Taylor*,
606 U.S. 522 (2025) .......... 28

*McKenna v. Weinberger*,
729 F.2d 783 (D.C. Cir. 1984) .......... 22, 25

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) ........ 26

*Mpoy v. Rhee*,
758 F.3d 285 (D.C. Cir. 2014) ........ 15, 18

*N.Y. Times Co. v. Dep't of Def.*,
824 F.Supp.3d 27 (D.D.C. 2026) ........ 5

*New York Times Co. v. Dep't of Def.*,
No. CV 26-1690 (PLF), 2026 WL 1872765 (D.D.C. June 30, 2026) ........ *passim*

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ........ 19

*Newsom v. Norris*,
888 F.2d 371 (6th Cir. 1989) ........ 27

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 30

*O'Donnell v. Barry*,
148 F.3d 1126 (D.C. Cir. 1998) ........ 21

*Pickering v. Bd. of Educ.*,
391 U.S. 563 (1968) ........ 16, 21

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
831 F.3d 500 (D.C. Cir. 2016) ........ 30

*Quiles Rodriguez v. Calderon*,
172 F. Supp. 2d 334 (D.P.R. 2001) ........ 27

*Rankin v. McPherson*,
483 U.S. 378 (1987) ........ 14, 20

*Sampson v. Murray*,
415 U.S. 61 (1974) ........ 26, 29

*Sanders v. District of Columbia.*,
85 F. Supp. 3d 523 (D.D.C. 2015) ........ 22, 25

*Storch v. Hegseth*,
804 F. Supp. 3d 216 (D.D.C. 2025) ........ 27

*Tabb v. D.C.*,
605 F. Supp. 2d 89 (D.D.C. 2009) ........ 16

*Tao v. Freeh*,
27 F.3d 635 (D.C. Cir. 1994) ........ 15

*Turner v. U.S. Agency for Glob. Media*,
502 F. Supp. 3d 333 (D.D.C. 2020) ........ 30

*Waters v. Churchill*,
511 U.S. 661 (1994) ........ 14

*Wilburn v. Robinson,*
480 F.3d 1140 (D.C. Cir. 2007) ........ 15

*Winder v. Erste*,
566 F.3d 209 (D.C. Cir. 2009) ........ 15, 16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 12

**Statutes:**

5 U.S.C. § 2105(c) ........ 12

**Rules and Regulations:**

Fed. R. Civ. P. 65(c) ........ 31

32 C.F.R. § 246.3(d) (2025) ........ 4

91 Fed. Reg. 1,706-01 (Jan. 15, 2026) ........ 7

91 Fed. Reg. 1,707 (Jan. 15, 2026) ........ 4

## INTRODUCTION

Once again, the Department of Defense ("DoD") and its leadership have violated the First Amendment. Once again, a reporter is forced to file suit to protect the very rights DoD leadership swore to uphold. And once again, this Court will need to intervene to protect the rights of journalists against the overreach of DoD.[1]

Plaintiff Jacqueline "Jacky" Smith is the wrongfully terminated Ombudsman of the storied newspaper, *Stars and Stripes* ("Stripes"). Her suit is not a complicated one, and discovery is unlikely to change the following material facts:

- Ms. Smith was an excellent Ombudsman, (Ex. 1 to Mot., Decl. of Jaqueline R. Smith ¶ 38 [hereinafter "Smith Decl."]; Ex. 7 to Smith Decl.);
- She published an article in Stripes, a national newspaper open to commentary by the public, (Smith Decl. ¶¶ 28–33; Ex. 5 to Smith Decl.);
- The article was critical of Defendants' efforts to curtail freedom of the press, (Ex. 5 to Smith Decl.); and
- She was fired less than two (2) weeks after publishing the article, (Smith Decl. ¶ 34; Ex. 6 to Smith Decl.).

---

[1] *See, e.g.*, *Kelly v. Hegseth*, 820 F. Supp. 3d 1, 24 (D.D.C. 2026); *N.Y. Times Co. v. Dep't of Def.*, No. CV 26-1690 (PLF), 2026 WL 1872765, at *15 (D.D.C. June 30, 2026); *see also Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 816 F. Supp. 3d 27, 65 (D.D.C. 2026); *Am. Bar Ass'n v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 248 (D.D.C. 2025) [hereinafter "*A.B.A.*"]; *Dardarian et al. v. U.S. Dep't of Def. et al.*, Case No. 1:26-CV-1965-CRC (D.D.C.).

Based on these facts alone, Ms. Smith is likely to prevail on her First Amendment retaliation claim. However, because her original term as Ombudsman is set to expire in December 2026, Ms. Smith cannot wait for the resolution of her suit.

Therefore, Ms. Smith now respectfully asks this Court to enter an order directing her reinstatement as Ombudsman of Stripes, for the remainder of her term or the resolution of this matter, whichever comes first.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. STRIPES HAS ENJOYED A PROUD HISTORY OF EDITORIAL INDEPENDENCE, THOUGH CONGRESS HAS HAD TO ACT TO ENSURE THAT INDEPENDENCE.

Stripes' publication dates to 1861 in the Civil War; it was reinstated in 1918 during World War I and, since World War II, has published continuously. (Smith Decl. ¶ 4). It provides news to service members and their families, as well as veterans, DoD civilians and contractors. (*Id.* ¶ 5). Importantly, Stripes provides these services to personnel stationed overseas who may have a harder time accessing unbiased news reporting. (*Id.*).

Stripes exists pursuant to DoD Instruction 1015.15, "Establishment, Management, and Control of Nonappropriated Fund Instrumentalities and Financial Management of Supporting Resources." Its operation is further directed by DoD Directive 5122.11, which makes clear that Stripes should be operated without editorial interference from DoD or political leadership, except in narrow situations involving danger to service members or national security. As stated by that Instruction:

> Editorial policies and practices of the STARS AND STRIPES shall be in accordance with journalistic standards governing U.S. daily commercial newspapers of the highest quality, with emphasis on matters of interest to the STARS AND STRIPES readership. Except as provided in paragraph 4.5., below, the DoD policy for the STARS AND STRIPES is that there shall be a free flow of news and information to its readership without news management or censorship. The calculated withholding of unfavorable news is prohibited.

(Ex. 2 to Mot., DoD Directive 5122.11 (current through Change 3, March 7, 2025) ¶ 4.2).

This independence, spelled out in regulation, was expressly supported by some of America's greatest military leaders. During World War I, General John "Blackjack" Pershing is reported to have said, "I do not believe that any one factor could have done more to sustain the morale of the [American Expeditionary Force] than the Stars and Stripes." (Smith Decl. ¶ 6). Decades later, General Dwight Eisenhower intervened to protect cartoonist Bill Mauldin. (*Id.* ¶ 7). Mr. Mauldin had irritated General George Patton with one of his cartoons—General Patton threatened to ban Stripes and jail Mauldin. (*Id.*). But General Eisenhower would not allow it. (*Id.*). He interceded and stated that "Stars and Stripes is the soldiers' newspaper. We will not interfere." (*Id.*).

This record of independence carried through the Korean and Vietnam wars. (*Id.* ¶ 8). However, in the 1980s, DoD attempted to assert influence over Stripes' coverage of the Iran-Contra Affair. (*Id.*). It was after this attempted interference that Congress intervened to ensure that Stripes remained the independent news source Generals Pershing and Eisenhower respected. (*Id.* ¶¶ 6–8).

One of the changes Congress made was to create the position of Ombudsman. (*Id.* ¶ 8). That position was previously defined in regulation:

> [Stripes] Ombudsman. A highly qualified journalist hired from outside the Department of Defense **<u>for a term of 3 years</u>** who independently advises the Unified Command CINCs, the [Stripes] commander/publisher, the Stars and Stripes editor, the Director of the AFIS, and the Congress on matters of readership interest in the Stars and Stripes.

32 C.F.R. § 246.3(d) (2025) (emphasis added). This provision was unexpectedly revoked by Defendants in January 2026. *See* 91 Fed. Reg. 1,707 (Jan. 15, 2026).

## II. MS. SMITH IS SELECTED FOR THE JOB.

Ms. Smith was hired as Ombudsman for Stripes in December 2023. (Smith Decl. ¶ 13). Before that, she had a long, successful career in journalism. (*Id.* ¶¶ 9–11). For forty years she worked as a journalist, a newsroom manager, and an editor. (*Id.* ¶ 9). She won awards for her work, which included reporting on the construction and operation of submarines in her home state of Connecticut. (*Id.* ¶¶ 10–11). Ms. Smith eventually worked as a journalist for Hearst Media, Connecticut, and won awards for her reporting and writing. (*Id.* ¶ 9).

Following a strenuous application process, Ms. Smith was offered the position of Ombudsman for Stripes; she accepted that offer on December 12, 2023, and began her three-year term on December 19, 2023, after passing a government security clearance. (*Id.* ¶¶ 13–14, 36).

Being Ombudsman was the best job Ms. Smith had during her career. (*Id.* ¶ 42). She loved the chance to engage in quality, ethical journalism while serving a unique and special population, America's servicemembers. (*Id.*).

## III. DEFENDANTS DO NOT RESPECT THE FREE PRESS, AND THAT LACK OF RESPECT WAS EVENTUALLY DIRECTED AT STRIPES.

Unfortunately for Ms. Smith, her job was about to become more difficult in 2025.

### A. Defendants work to undermine free press generally.

Sadly, Ms. Smith's termination is not the first example of Defendants' attempts to erode the First Amendment. *See generally Kelly*, 820 F. Supp. 3d 1; *N.Y. Times*, 2026 WL 1872765; *N.Y. Times Co. v. Dep't of Def.*, 824 F.Supp.3d 27 (D.D.C. 2026); *Dardarian*, Case No. 1:26-CV-1965-CRC (D.D.C.).

In his opinion granting the *New York Times'* motion for preliminary injunction against new DoD press access policies, Judge Friedman cataloged Secretary Hegseth's, Mr. Parnell's, and other DoD officials' efforts to undermine the free press:

> Pete Hegseth was confirmed as Secretary of Defense on January 24, 2025. "Before and during Secretary Hegseth's confirmation process, news outlets, including The Times, reported extensively on his background, including allegations of past sexual assault, excessive drinking, and marital infidelity, as well as questions about his lack of relevant experience." Secretary Hegseth and other Department officials "have complained openly about reporting that they perceive as unfavorable to them and the Department." Following Secretary Hegseth's confirmation, the Department began taking unprecedented actions with respect to journalists covering the Department and its leadership. Just weeks after the confirmation, for example, the Department announced that it would be requiring several news outlets—specifically, The Times, NBC News, Politico, National Public Radio, CNN, The Hill, and The War Zone—to leave their dedicated workspaces in the Pentagon as part of a new "rotation" system.
>
> In March 2025, the editor-in-chief of The Atlantic reported that Secretary Hegseth and other top officials had inadvertently included him in a group chat on the messaging platform Signal in which officials disclosed details regarding imminent U.S. airstrikes in Yemen. That same month, a journalist with The Times reported that Secretary

> Hegseth also had shared details about U.S. plans to strike Yemen in a second private Signal group chat that included Defendant Timothy Parlatore, a Senior Advisor to Secretary Hegseth, as well as Secretary Hegseth's wife and brother. Following this reporting, Defendant Sean Parnell, the Assistant to the Secretary of Defense for Public Affairs, called The Times "garbage," and Secretary Hegseth accused The Times of "slashing and burning people to ruin their reputations." Both Mr. Parnell and Secretary Hegseth specifically criticized The Times' choice of sources for its reporting, including the use of anonymous sources. Other officials made similar remarks in response to reporting on the Department, such as referring to journalists as "scum" and calling for their "severe punishment."

*N.Y. Times*, 2026 WL 1872765, at *3.

B. Defendants turn their sights on Stripes.

This general disdain for free, independent press, was eventually turned on Stripes. On January 15, 2026, Defendant Sean Parnell posted the following from his X account:

> The Department of War is returning Stars & Stripes to its original mission: reporting for our warfighters.
>
> We are bringing Stars & Stripes into the 21st century. We will modernize its operations, refocus its content away from woke distractions that syphon morale, and adapt it to serve a new generation of service members.
>
> Stars & Stripes will be custom tailored to our warfighters. It will focus on warfighting, weapons systems, fitness, lethality, survivability, and ALL THINGS MILITARY. No more repurposed DC gossip columns; no more Associated Press reprints.
>
> Stars & Stripes has a proud legacy of reporting news that's important to our service members. The Department of War is committed to ensuring the outlet continues to reflect that proud legacy.

(Ex. 1 to Smith Decl.).

The day before Mr. Parnell made his post criticizing Stripes as "woke," the Washington Post reported that applicants for jobs at Stripes were being asked what they would do to support President Donald Trump's policies. *See* Liam Scott, S*tars and Stripes job applicants are asked if they back Trump policies*, Wash. Post (Jan. 14, 2026), https://perma.cc/U6NW-3J5D.

On January 15, 2026, the same day as Defendant Parnell's post on X, DoD purported to rescind the federal regulations protecting Stripes' editorial independence. Stars and Stripes Media Organization, 91 Fed. Reg. 1,706-01 (Jan. 15, 2026).[2] Those regulations had been in place since April 22, 1994. *Id.* at 1,706. The regulations were rescinded without affording any opportunity for public comment. (Smith Decl. ¶¶ 21–22).

Consistent with these initial moves against Stripes, on March 9, 2026, Defendant Feinberg published a memorandum on behalf of the DoD (the "March 9 Memo"). (Ex. 2 to Smith Decl.).

The March 9 Memo was addressed to "SENIOR PENTAGON LEADERSHIP[,] COMMANDERS OF THE COMBATANT COMMANDS[,] DEFENSE AGENCY AND DOW FIELD ACTIVITY DIRECTORS." The Subject was "Modernization of Stars and Stripes Operations." It directed the following:

- Directed that Stripes would no longer "serve as a reprint vehicle for commercial news publication that are otherwise readily accessible[]";

[2] This regulatory action is the subject of another pending suit in this district, *Dardarian et al. v. U.S. Dep't of Def. et al.*, Case No. 1:26-CV-1965-CRC (D.D.C.).

- Directed the Assistant Secretary of [Defense] for Public Affairs to update DoD policies in accordance with the March 9 Memo; and
- Published interim policy and procedural guidance.

The policy guidance included with the March 9 Memo made several changes to existing policies, including that:

- "Stripes briefings or reports to and non-newsgathering engagements with Congress must be coordinated beforehand" with DoD leadership;
- "Stripes may not present its own editorial position, and its personnel may not use Stripes news coverage to advance an editorial position, point of view, or particular interest[]";
- "Stripes content must be consistent with good order and discipline of the military[]"; and
- "Stripes is **prohibited**[3] from purchasing or contracting for news stories, features, syndicated columns, comic strips, and editorial cartoons from commercial news media services or sources due to the digital availability of such content globally," unless DoD leadership granted an exception.

The policy guidance in the March 9 Memo also made several changes to Stripes' Ombudsman position, including that the Ombudsman must submit all reports intended for Congress through DoD leadership. (Ex. 2 to Smith Decl., at 6–7; Smith Decl. ¶ 24).

---

[3] The word "prohibited" is bolded in the original. (Ex. 2 to Smith Decl., at 4).

Defendants' changes to Stripes' governance and operation gained the attention of several members of Congress and, on April 8, 2026, Senators Warren, Blumenthal, Duckworth, Gallego, Hirono, and Kelly, all of the Senate Armed Services Committee, wrote a letter to Defendant Feinberg seeking an explanation for DoD actions to "attempt to undermine the editorial independence and First Amendment protections of *Stars and Stripes*." (Ex. 3 to Smith Decl.). Likewise, on April 15, 2026, Representative Jamie Raskin and thirty-nine (39) of his peers wrote a similar letter to Defendant Hegseth expressing their concerns about DoD changes related to Stripes. (Ex. 4 to Smith Decl.).

## IV. MS. SMITH SPEAKS OUT, AND DEFENDANTS FIRE HER WITHOUT EXPLANATION.

It was against this backdrop that Ms. Smith published the column that led to her termination. On April 8, 2026, Ms. Smith published a column in Stripes entitled "*Stars and Stripes readers insist: Bring back our color comics!*" (the "April 8 Column"). (Ex. 5 to Smith Decl.).

### A. The April 8 Column: A critique of Defendants that pulled no punches.

Ms. Smith noted that the April 8 Column was her opinion and not the position of Stripes. (Ex. 5 to Smith Decl., at 2).

The April 8 Column started on a critical note: "Pete Hegseth doesn't want you to see cartoons in this newspaper anymore. And loyal readers of Stars and Stripes are hopping mad." (*Id.* at 1). From there, it offered Ms. Smith's criticisms of DoD leadership for their efforts to undermine Stripes. (*See generally id.*).

Ms. Smith documented how the loss of comics was happening "within the broader context of the Pentagon attempting to restrict the mainstream media," including:

- Closing off areas of Pentagon to journalists without a DoD escort; and
- Requiring journalists to sign an agreement "essentially saying [they] would not use any information not authorized by the department."

As Ms. Smith noted, this trend was now impacting Stripes, as evidenced by the January 15, 2026 social media post by Defendant Parnell on X, and the March 9 Memo. (*Id.* at 3).

Ms. Smith opined that these changes were, from her viewpoint, "censorship, an infringement on Stripes' editorial independence." She closed April 8 Column with this:

> "One of the readers objecting to the loss of 'Beetle Bailey' and 'Garfield' and all the other comic strips in Stripes wondered if anyone was reading their comments. Yes, I have read them and so has Stripes leadership as well as the Publisher's Advisory Board comprised of journalism executives from around the country.
>
> Pentagon leadership, which can do something about it, ought to read them, too."

(*Id.*).

B. <u>Defendants fire Ms. Smith less than two weeks after the April 8 Column.</u>

Less than two weeks after publishing the April 8 Column, Ms. Smith was terminated. (Smith Decl. ¶¶ 34–35; Ex. 6 to Smith Decl.).

On April 21, 2026, Stripes' Publisher, Max Lederer, texted Ms. Smith to say they needed to talk. (*Id.* ¶ 35). When they met, he told Ms. Smith that her

employment would be terminated immediately, as instructed by Parnell. (*Id.* ¶¶ 35, 37). Mr. Lederer said he had not been given a reason for the termination, and he showed Ms. Smith the termination form he had been provided by Defendant Parnell. (*Id.* ¶¶ 35, 27). Ms. Smith was provided DA Form 3434, February 1989 edition, stating that:

- The personnel action was being taken pursuant to Army Regulation 215-3, Chapter 2-19b;
- That the action was "without prejudice and [did] not preclude the employee from being hired by another NAFI activity"; and
- That the action was "not grievable."

(Ex. 6 to Smith Decl.).

As Assistant to the Secretary of Defense for Public Affairs, Mr. Parnell was responsible for the oversight and operation of Stripes. (Smith Decl. ¶ 40).

Ms. Smith's term as Ombudsman was originally scheduled to continue until December 19, 2026. (*Id.* ¶ 36). She was not given a reason for her termination. (*Id.* ¶ 37). She never had any negative performance reviews, reprimands, or job performance issues. (*Id.* ¶ 38).

C. <u>The aftermath: Ms. Smith's termination has shaken the Stripes staff.</u>

Stripes is still without an Ombudsman. (*Id.* ¶ 47). Instead, DoD has recently assigned a uniformed officer to a newly created position, Assistant Publisher. (*Id.* ¶ 46). Meanwhile, the staff at Stripes are worried and afraid to speak out following Ms. Smith's termination. (*Id.* ¶ 45).

## V. PROCEDURAL HISTORY

Because of her status as an employee of a nonappropriated fund instrumentality ("NAFI"), Ms. Smith did not have recourse to the administrative procedures available to many civil servants. *See* 5 U.S.C. § 2105(c); *Clark v. Merit Sys. Prot. Bd.*, 361 F.3d 647, 651 (Fed. Cir. 2004). Her classification under Army Regulation 215-3 meant she did not have any appeal rights within DoD. (*See* Compl., DE 3-1 ¶ 37).

Without recourse to administrative remedies, Ms. Smith filed suit in this Court on June 25, 2026. (DE 1). On June 26, 2026, Ms. Smith filed a Notice of Errata and Corrected Complaint to add the Parties' addresses. (DE 3, 3-1). Ms. Smith brings the following claims:

- First Claim: First Amendment Retaliation against DoD and All Individual Defendants in Their Official Capacities;
- Second Claim: Declaratory Judgment; and
- Third Claim: *Bivens* Claim against Defendant Parnell in His Individual Capacity.

Service of process was accomplished on all Defendants in mid-July.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

A plaintiff need only show the likelihood of success on one of its claims to merit injunctive relief. *A.B.A.*, 783 F. Supp. 3d at 242.

## ARGUMENT

The Court should grant Ms. Smith's Motion and order her re-instated as the Ombudsman for Stripes until the completion of her term on December 19, 2026. First, Ms. Smith is likely to succeed on the merits of her First Amendment retaliation claim. Second, if the Motion is not granted, she will suffer irreparable harm because her original term as Ombudsman will expire before this matter is resolved. Finally, the equities are in Ms. Smith's favor because she is vindicating First Amendment rights against unconstitutional overreach by the DoD.

### I. MS. SMITH IS LIKELY TO SUCCEED ON THE MERITS OF HER FIRST AMENDMENT RETALIATION CLAIM.

Discovery will not change the following core facts:

- Ms. Smith was an excellent Ombudsman;
- She published an article in an international newspaper;
- The article was critical of Defendants' efforts to curtail freedom of the press; and
- She was fired less than two weeks after publishing the article.

Based on these facts alone, Ms. Smith is likely to prevail on her First Amendment retaliation claim.

A. The Government cannot fire one of its employees for engaging in protected speech.

"The First Amendment forbids abridgment of the 'freedom of speech.'" *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 415 (1979). Accordingly, as a "general matter, the First Amendment prohibits government officials from subjecting individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022).

Deciding to serve in government does not change that fact, and "public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). That means a "public employer 'may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.'" *LeFande v. District of Columbia*, 613 F.3d 1155, 1158 (D.C. Cir. 2010) (quoting *Rankin v. McPherson,* 483 U.S. 378, 383 (1987)). Indeed, because of their insight and expertise in matters of public concern, "[t]here is considerable value . . . in encouraging, rather than inhibiting, speech by public employees." *Lane v. Franks*, 573 U.S. 228, 236 (2014); *Garcetti*, 547 U.S. at 419; *Waters v. Churchill*, 511 U.S. 661, 674 (1994).

Courts apply a four-factor test, known as the "*Pickering* factors," when assessing a public employee's First Amendment Retaliation claim:

> **First**, the public employee must have spoken as a citizen on a matter of public concern. **Second**, the court must consider whether the governmental interest in promoting the efficiency of the public services it performs through its employees outweighs the employee's interest, as a citizen, in commenting upon matters of public concern. **Third**, the employee must show that [her] speech was a substantial or motivating factor in prompting the retaliatory or punitive act. **Finally**, the

> employee must refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.

*Bowie v. Maddox*, 642 F.3d 1122, 1133 (D.C. Cir. 2011) (bold and underline added) (quoting *Wilburn v. Robinson,* 480 F.3d 1140, 1149 (D.C. Cir. 2007)); *accord Johnson v. District of Columbia*, 182 F.4th 1051, 1058 (D.C. Cir. 2026); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The first two factors are questions of law for the Court to resolve, and the latter two are usually questions of fact for a jury. *Tao*, 27 F.3d at 639.

1. *The first factor: An employee who speaks in a public forum in an unofficial capacity on a matter of public concern is engaged in protected speech.*

The first factor is critical—if the speech is protected, then the government must "justify treating its employees differently from other citizens." *Winder v. Erste*, 566 F.3d 209, 214 (D.C. Cir. 2009). Determining whether the speech is protected involves a two-step process: "for the speech to be protected, the employee must have spoken (1) as a citizen, and (2) on a matter of public concern." *Mpoy v. Rhee*, 758 F.3d 285, 290 (D.C. Cir. 2014).

a. Step One within the First Factor: Unofficial speech made in a public forum is speech made by a citizen, not an employee.

Whether an employee is speaking as a citizen or employee is dependent on context. *See, e.g.*, *Mpoy*, 758 F.3d at 292. If employees make statements "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes . . . ." *Garcetti*, 547 U.S. at 421. However, formal job descriptions are not determinative, *id.* at 424–25, and "[s]peech can be covered by the First Amendment

even if it is related to one's job function," *Winder*, 566 F.3d at 216 (citing *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968)).

Important context includes the content of the speech and the forum in which it is made. *See, e.g.*, *Garcetti*, 547 U.S. at 423; *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 175 (1976) ("Where the State has opened a forum for direct citizen involvement, it is difficult to find justification for excluding teachers who make up the overwhelming proportion of school employees and who are most vitally concerned with the proceedings"). An employee who speaks because of her concern as a citizen—not just an employee concerned with doing her job—speaks as a citizen, not an employee. *See Jones v. Quintana*, 658 F. Supp. 2d 183, 194 (D.D.C. 2009) ("Plaintiff does not allege solely that she spoke out because she was worried that she would be required to work more or that her job would become more difficult . . . . Rather, Plaintiff has also alleged that she spoke out regarding her concerns that the proposed changes would detrimentally affect the public's safety."); *see also Garcetti*, 547 U.S. at 416 (discussing special concurrence in decision below). Whether the speech was made in an official capacity also matters, because employers may control "official" communications. *Garcetti*, 547 U.S. at 422–23.

As for forum, courts should "carefully consider the forum and audience for an employee's speech in conjunction with the employee's job responsibilities to determine whether the speech is protected by the First Amendment." *Tabb v. D.C.*, 605 F. Supp. 2d 89, 94 (D.D.C. 2009). Speech made by an employee concerning their job but in a

public forum is protected speech. *E.g.*, *City of Madison*, 429 U.S. at 175–76; *Johnson*, 182 F.4th at 1061.

A recent decision by the D.C. Circuit illustrates these points, *Johnson v. District of Columbia*, 182 F.4th 1052 (D.C. Cir. 2026). The Plaintiff in *Johnson* was a D.C. correctional officer and president of the correctional officers' union. *Id.* at 1056. During the COVID-19 pandemic, Ms. Johnson regularly spoke out about unsafe conditions in D.C. jails. *Id.* As part of her campaign, Ms. Johnson took two actions: (1) she shared confidential departmental emails with reporters, and (2) she participated in a news interview with a local TV station. *Id.* The D.C. Department of Corrections terminated her employment, and Ms. Johnson sued, alleging her First Amendment rights had been violated. *Id.* Following cross motions for summary judgment, the district court denied both.

The Court of Appeals affirmed in part and reversed in part. As for termination based on the sharing of confidential emails outside the Department of Corrections, the Court of Appeals found that the interest of the Department in protecting confidential information outweighed Ms. Johnson's First Amendment rights. *Id.* at 1060.[4]

As to Ms. Johnson's claim based on the TV interview, however, the Court of Appeals affirmed the denial of the summary judgment motions, reasoning:

> Johnson may yet be able to show that Patten violated her First Amendment rights by firing her because of her interview with WUSA 9.

---

[4] Defendants in *Johnson* did not contest that the sharing of the confidential emails satisfied the first *Pickering* factor. *Johnson*, 182 F.4th at 1059.

> As for the interview, *defendants conceded the first two Pickering factors before the district court*. They acknowledged that Johnson spoke as a private citizen and addressed a matter of public concern—namely, the "alleged spread of a contagious disease among [Department] personnel and inmates due to [Department] mismanagement." And they fail to identify any statement from Johnson's interview that interfered with the government's interests as an employer. That omission makes sense. *As a senior Department employee and a Union leader, Johnson had an unusually "beneficial and well-informed" perspective to share on the Department's actions during the pandemic* . . . .

*Id.* at 1061 (emphasis added). Indeed, "Johnson's interview represents a paradigmatic case of a government employee speaking out on an issue that she is uniquely qualified to address and thereby supporting informed decision-making by the electorate." *Id.* (cleaned up). For that reason, Ms. Johnson's claim, to the extent it relied on the TV interview, satisfied the first two *Pickering* factors, as a matter of law. *Id.*

In sum, making unofficial statements in public forums indicates an employee is speaking as a citizen, even if the speech concerns their job. *See Garcetti*, 547 U.S. at 422 ("Contrast, for example, the expressions made by the speaker in *Pickering,* whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day."); *Johnson*, 182 F.4th at 1060.

b. The First Factor, Step Two: Freedom of the press is a matter of public concern.

If the employee acted as a citizen when speaking, the second step in the first-factor inquiry is whether the matter was one of public concern. *Mpoy*, 758 F.3d at 290.

"[S]peech relates to a matter of public concern if it is of political, social, or other concern to the community." *LeFande*, 613 F.3d at 1159 (cleaned up) (quoting *Hall v. Ford*, 856 F.2d 255, 259 (D.C. Cir. 1988)); *accord Connick v. Myers*, 461 U.S. 138, 146 (1983). "[S]peech that concerns 'issues about which information is needed or appropriate to enable members of society' to make informed decisions about the operation of their government merits the highest degree of first amendment protection." *LeFande*, 613 F.3d at 1159 (quoting *Hall*, 856 F.2d at 259). Matters of public concern include

> "opposition to national foreign policy," *Bond v. Floyd*, 385 U.S. 116, 132 (1966), and even "vehement, caustic, and . . . unpleasantly sharp attacks on government and public officials," *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

*Kelly*, 820 F. Supp. 3d at 19. By contrast, speech involving "individual personnel disputes and grievances" are of little or "no relevance to the public's evaluation of the performance of governmental agencies." *LeFande*, 613 F.3d at 1159 (quoting *Hall*, 856 F.2d at 259).

Government censorship is a matter of public concern. *See Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 231 (6th Cir. 2005). So, too, is the unlawful administration of the DoD. *See Kelly*, 820 F. Supp. 3d at 19 (granting preliminary injunctive relief and concluding that "[u]nder any reading of the law, Senator Kelly's statements constitute speech on matters of public concern" and are therefore entitled to special protection" (cleaned up)).

"Speech concerning public affairs is more than self-expression; it is the essence of self-government." *Connick*, 461 U.S. at 145. Ergo, speech discussing public affairs is a matter of public concern.

2. *The Second Factor: Protected speech should not be curtailed unless it causes a significant disruption to government operations.*

If the first *Pickering* factor is satisfied, the speech is the constitutionally protected speech of a citizen. At that point, the employer "must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

In order to protect government efficiency, the second *Pickering* factor requires the Court to balance the government's interest in efficiency with the employee's rights. *Bowie*, 642 F.3d at 1133. To do that, courts must "identify the speech that contributed to [the employee's] discharge, and then balance [her] interest in making her statement against the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees." *Johnson*, 182 F.4th at 1059 (cleaned up). Courts must consider "'the manner, time, and place of the employee's expression,' as well as the 'context in which the dispute arose.'" *Id.* (quoting *Rankin*, 483 U.S. at 388).

When weighing the government's interest, important considerations include

> whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

*Rankin*, 483 U.S. at 388.

By contrast, speech that is "in no way directed towards any person with whom [the employee] would normally be in contact in the course of [her] daily work" is unlikely to cause a disruption. *Pickering*, 391 U.S. at 569–70. Likewise, speech by employees without policy making or executive authority is less likely to cause disruptions justifying restrictions on constitutional rights. *See O'Donnell v. Barry*, 148 F.3d 1126, 1136 (D.C. Cir. 1998) (noting that, following a demotion, a plaintiff was not a "key deputy").

In weighing the value of the speech, government employees who speak out on "an issue [they are] uniquely qualified to address" have a significant interest in making the speech. *Johnson*, 182 F.4th at 1061. And, again, "[s]peech that concerns issues about which information is needed or appropriate to enable members of society to make informed decisions about the operation of their government merits the highest degree of first amendment protection." *O'Donnell*, 148 F.3d at 1133 (quoting *Hall,* 856 F.2d at 259).

If value of the speech outweighs the effects on efficiency, the second *Pickering* factor is satisfied.

3. *The Third Factor: When an otherwise commendable employee is fired within two weeks of speaking, there is likely a causal relationship.*

For the third *Pickering* factor, "the employee must show that [her] speech was a substantial or motivating factor in prompting the retaliatory or punitive act." *Bowie*, 642 F.3d at 1133. Direct evidence of animus is not required, and "[c]ausation may be inferred . . . when the retaliatory act follows close on the heels of the protected activity." *Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 47 (D.D.C. 2021),

*aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023) (quoting *BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015)); *see also N.Y. Times Co.*, 2026 WL 1872765, at *10 ("The D.C. Circuit has explained in the context of First Amendment retaliation that circumstantial evidence is equally as probative as direct evidence in proving illegitimate intent." (citation and quotation omitted)).

Temporal proximity is a strong indicator of causation. *See Sanders v. District of Columbia.*, 85 F. Supp. 3d 523, 535 (D.D.C. 2015) (citing *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009)); *see also McKenna v. Weinberger*, 729 F.2d 783, 791 (D.C. Cir. 1984) (stating in the Title VII context, that "given that a number of officers knew of the . . . investigation and that the adverse action followed so closely, it is clear that there was enough evidence to establish the causal connection"). In the First Amendment and Title VII context, the following time periods supported a causal link: six (6) weeks, *Sanders*, 85 F. Supp. 3d at 535 (First Amendment); twenty-two days, *McKenna*, 729 F.2d at 786–87, 791 (Title VII); five (5) days, *Am. Acad. of Pediatrics*, 816 F. Supp. 3d at 54 (First Amendment); and three months, *A.B.A.*, 783 F. Supp. 3d at 246.

Courts in this district have recently granted preliminary injunctions based, in part, on these same time periods in First Amendment retaliation cases. *See Am. Acad. of Pediatrics*, 816 F. Supp. 3d at 54; *A.B.A.*, 783 F. Supp. 3d at 242.

Finally, in addition to temporal proximity, "the defendant's expression of hostility to the protected speech, and the absence of a proffered legitimate alternative

explanation for the action can support a finding that protected speech caused the agency's response." *N.Y. Times*, 2026 WL 1872765, at *10.

4. *Fourth Factor: In some cases, the government may come forward with evidence of other reasons justifying termination.*

The final *Pickering* factor requires that the employee "refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech." *Bowie*, 642 F.3d at 1133. However, if the government employer cannot "articulate any legitimate reason" for the adverse employment action, then the fourth factor is satisfied. *See Jones v. Rivers*, 722 F. Supp. 771, 781 (D.D.C. 1989).

B. <u>There is no question that Ms. Smith was fired for exercising her First Amendment rights.</u>

Based on the foregoing, the record establishes that Ms. Smith is likely to succeed on her First Amendment Retaliation Claim. She was a model Ombudsman. She spoke as a citizen on a matter of public concern in her April 8 Column. She was fired for doing so, and her speech did not have any deleterious effects on the DoD.

1. *Ms. Smith spoke as a citizen on a matter of public concern.*

To begin, there is no question the April 8 Column touched on a matter of public concern. *LeFande.*, 613 F.3d at 1159. It discussed recent changes to the editorial independence of a historic, national newspaper serving American servicemembers. The fact that the DoD and its leadership are trying to convert Stripes from a news publication into a viewpoint-specific, public affairs engine is of great concern to the public.

And Ms. Smith was writing about those grave public concerns as a private citizen, not as the Ombudsman. This is apparent from the context, forum, and content of the speech in question, her April 8 Column. (*See generally* Ex. 5 to Smith Decl.).

First, Ms. Smith expressly noted that the "column is my opinion; no one at Stripes asked or encouraged me to write it. All of my ombudsman columns are copy edited for grammar and style with no changes to content before publishing." (*Id.* at 2). In short, her column was not an official communication—it was akin to a letter to the editor that any member of the public could have provided.

Second, the April 8 Column was also published in Stripes, a national newspaper. It was not submitted through internal channels. *Cf. Garcetti*, 547 U.S. at 414. It was a forum open to nonemployees of Stripes. Indeed, much of the April 8 Column discussed and repeated comments from the public following Secretary Hegseth's decision to eliminate cartoons and AP Wire stories from Stripes.

Third, Ms. Smith did not write the April 8 Column to remove an obstacle to her job. She didn't write the April 8 Column because she was attempting to perform her duties, she was writing it as a journalist of 40 years who was concerned as she watched the federal government tell journalists how to do their jobs. (Smith Decl. ¶¶ 30–31).

The facts here are almost identical to those in *Johnson v. District of Columbia*. Just as the plaintiff in *Johnson*, Ms. Smith spoke through public media about issues affecting her job, issues of significant public concern, and she was fired for doing so.

In sum, Ms. Smith is likely to succeed in establishing that the April 8 Column satisfied the First *Pickering* Factor.

2. *The April 8 Column did not affect efficiency, except to the extent it challenged Defendants' efficient takeover of Stripes.*

Ms. Smith's speech in the April 8 Column was protected by the Constitution. As such, it "must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

Ms. Smith's speech did nothing to impair the efficiency of the operation of Stripes. For example, though Ms. Smith worked for Stripes, she did not work directly for the people she was criticizing, namely Secretary Hegseth. (Smith Decl. ¶ 15). In fact, Ms. Smith has never met Secretary Hegseth or the other individual Defendants. (*Id.* ¶ 16). As such, the April 8 Column was unlikely to cause any hostility or disruptions in the chain-of-command.

Ms. Smith wrote an opinion piece in a newspaper about the newspaper's editorial and operational independence. Any argument that her speech impaired the newspaper's ability to operate is nonsensical.

3. *Ms. Smith was fired less than two weeks after publishing the April 8 Column—the column was the reason she was fired.*

Less than two weeks passed between the April 8 Column and Ms. Smith's termination, a far shorter period than what other courts have found supported retaliation claims. *Sanders*, 85 F. Supp. 3d at 535 (six weeks); *McKenna*, 729 F.2d at 791 (22 days); *A.B.A.*, 783 F. Supp. 3d at 246 (three months, granting motion for

preliminary injunction); *see also Am. Acad. of Pediatrics*, 816 F. Supp. 3d at 54 (five days, granting motion for preliminary injunction).

Ms. Smith was fired from a job she loved. (Smith Decl. ¶ 42). She never had a negative performance review or any performance issues. (*Id.* ¶ 38; Ex. 7 to Smith Decl.). She was fired without explanation. (Smith Decl. ¶ 37). She was fired less than two weeks after she published the April 8 Column. (*Id.* ¶ 34).

Ms. Smith is likely to succeed in showing the Third *Pickering* factor is satisfied.

4. *The Fourth Factor*

Finally, it is unlikely the government will come forward with any legitimate explanation for Ms. Smith's termination. She was a successful Ombudsman who was respected by her peers. (Smith Decl. ¶ 38; Ex. 7 to Smith Decl.). The Fourth *Pickering* factor will, therefore, also be satisfied.

C. <u>Ms. Smith is likely to succeed on the merits of her First Amendment retaliation claim.</u>

In sum, Ms. Smith is likely to succeed on her First Amendment retaliation claim, satisfying the first legal requirement for a preliminary injunction.

## II. MS. SMITH'S TERM IN HER CONGRESSIONALLY MANDATED POSITION IS LIKELY TO EXPIRE BEFORE THIS MATTER IS RESOLVED, RESULTING IN IRREPARABLE HARM.

If a plaintiff establishes she is likely to succeed on the merits of her underlying claim, the court must then determine if she will suffer irreparable harm, absent injunctive relief. *Media Matters for Am. v. Paxton*, 138 F.4th 563, 585 (D.C. Cir. 2025). Government employees terminated in "extraordinary situations" beyond "routine" discharge cases suffer irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 92 n.68

(1974). Ms. Smith's case is extraordinary, because (1) she filled a congressionally mandated role; (2) she was publicly terminated for exercising her constitutional rights; and (3) her termination has left Stripes' ability to perform its function less certain. These extraordinary factors are "sufficient in kind and degree to override the factors militating against the issuance of preliminary relief in Government personnel actions." *Berry v. Reagan*, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983).

### A. Ms. Smith's early termination from a congressionally mandated role for exercising constitutional rights constitutes extraordinary circumstances.

The loss of a term of employment for exercising constitutional rights constitutes irreparable harm. *See Newsom v. Norris*, 888 F.2d 371, 375 (6th Cir. 1989) ("It is well recognized that it is constitutionally impermissible to terminate even a unilateral expectation of a property interest in a manner which violates rights of expression protected by the First Amendment."). And the loss of the opportunity to perform a fixed-term job is a harm that cannot be adequately remedied with monetary damages after the term ends. *See Quiles Rodriguez v. Calderon*, 172 F. Supp. 2d 334, 344 (D.P.R. 2001). This is especially true if the position is congressionally mandated. *See Dellinger v. Bessent*, 766 F. Supp. 3d 57, 70 (D.D.C. 2025), *appeal dismissed,* No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ("[P]laintiff was appointed for a fixed term, and he has a statutory mission that his removal has rendered him unable to fulfill."). *But see Storch v. Hegseth*, 804 F. Supp. 3d 216, 227 (D.D.C. 2025).[5]

---

[5] *Storch* is distinguishable in key way: The inspectors general were not fired for the exercise of their constitutional rights. *See Storch*, 804 F. Supp. 3d at 224. By contrast,

Apart from the loss of a fixed term position, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mahmoud v. Taylor*, 606 U.S. 522, 569 (2025). For that reason, once a plaintiff shows "a likelihood of success on the merits, 'the Court need not belabor the other preliminary-injunction factors.'" *N.Y. Times Co. v. Dep't of Def.*, No. CV 26-1690 (PLF), 2026 WL 1872765, at *13 (D.D.C. June 30, 2026) (quoting *Endocrine Soc'y v. Fed. Trade Comm'n*, No. CV 26-512 (JEB), 2026 WL 1257289, at *14 (D.D.C. May 7, 2026)). Continued leverage over a plaintiff's speech can constitute such harm. *See Am. Acad. of Pediatrics*, 816 F. Supp. 3d at 61 ("This continued leverage over AAP functions to "keep[ ] the sword of Damocles hanging" as a deterrent against future speech.").

Finally, irreparable harm also includes harm to an organization's operations and missions pending the outcome of litigation. *See A.B.A.*, 783 F. Supp. 3d at 247 ("The loss of funding thus "threaten[s] the very existence of the movant's" operations.").

Ms. Smith is likely to succeed on her First Amendment retaliation claim. However, if December 19, 2026, comes and goes before her rights are vindicated, she will suffer irreparable harm. Meanwhile, Stripes is without an Ombudsman, other Stripes employees are on notice that independent journalism is not tolerated by

---

Ms. Smith, who also filled a congressionally mandated role, was fired for exercising her own First Amendment rights and seeking to protect the rights of others.

Defendants, and uniformed military officers are now involved in Stripes journalism and reporting. (*See* Smith Decl. ¶¶ 45–47).

B. The *Sampson* factors do not caution restraint.

In *Sampson v. Murray*, the Supreme Court set out three factors that may caution against injunctive relief. The Court explained that, in cases of government employees seeking injunctive relief,

> the irreparable harm must be in kind and degree to override three factors that the court should give serious weight: (1) the disruptive effect which the grant of the temporary relief has on the administrative process; (2) the well-established rule that the government has traditionally been granted the widest latitude in the dispatch of its own internal affairs; and (3) the traditional unwillingness of courts . . . to enforce contracts for personal service.

*Dellinger*, 766 F. Supp. 3d at 69 (internal quotations omitted) (quoting *Sampson*, 415 U.S. at 83).

None of these cautionary factors apply to Ms. Smith. First, there is no administrative process for Ms. Smith to pursue. (Compl. ¶ 37). Second, while the government may be granted wide latitude in run-of-the-mill personnel matters, Ms. Smith's matter has a constitutional dimension that is undisputed—it is not routine. Finally, this is not a case about a personal services contract. It is a case about a congressional watchdog being terminated for exercising her First Amendment rights.

In sum, none of the *Sampson* factors undercut the finding of irreparable harm.

C. If Ms. Smith is not reinstated before her meritorious First Amendment claim is resolved, she will suffer irreparable harm.

Ms. Smith filled a congressionally mandated position. She was for exercising her First Amendment rights, rights she exercised to protect the same rights for

others. In short, "[t]his is not a routine case." *Dellinger*, 766 F. Supp. 3d at 69. It is extraordinary, and it requires immediate action from the Court to ensure she can complete her term as her meritorious First Amendment retaliation claim is resolved in litigation.

### III. PUBLIC INTEREST FAVORS GRANTING RELIEF BECAUSE CONGRESS' WILL IS BEING THWARTED.

Finally, "[o]nce an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest." *Nken v. Holder*, 556 U.S. 418, 435 (2009). However, "[t]hese factors merge when the Government is the opposing party." *Id.*

"Government actions in contravention of the Constitution are 'always contrary to the public interest.'" *A.B.A.*, 783 F. Supp. 3d at 247–48 (quoting *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020)); *accord Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013). "Indeed, the Constitution is the ultimate expression of the public interest, and therefore, government actions in contravention of the Constitution are always contrary to the public interest." *Kelly*, 820 F. Supp. 3d at 23–24 (cleaned up).

"[T]here is always a strong public interest in the exercise of free speech rights," *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016), and retaliation against one speaker "threatens retaliation against all," *Kelly*, 820 F. Supp. 3d at 24 (quoting *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 115 (D.D.C. 2025)). Consistent with that principle, in "First Amendment cases,

the likelihood of success will often be the determinative factor." *Am. Acad. of Pediatrics*, 816 F. Supp. 3d at 63 (quoting *Paxton*, 138 F.4th at 584).

Ms. Smith's First Amendment rights have been violated as part of Defendants' efforts to undermine those rights more broadly. Retaliation against her is retaliation against everyone at Stripes. It puts all journalists on notice that free, independent journalism is not tolerated.

These are unconstitutional actions and, as such, are not in the public's interest.

## IV. A BOND IS NOT APPROPRIATE HERE.

Ms. Smith contends a bond is not appropriate here. *See* Fed. R. Civ. P. 65(c). Ms. Smith is represented by pro bono counsel and is currently unemployed. (Smith Decl. ¶ 44).

To the extent the Court requires a bond, Ms. Smith respectfully requests that it impose only a nominal bond.

## CONCLUSION

For the foregoing reasons, Ms. Smith respectfully asks the Court grant her Motion for Preliminary Injunction and enter an order requiring Defendants to re-instate her to the position of Ombudsman immediately for the remainder of her term.

Respectfully submitted, this, the 21st day of August 2026.

/s/ John Bussian
John Bussian
N.C. State Bar No. 15487
jbussian@aol.com
THE BUSSIAN LAW FIRM PLLC
150 Fayetteville Street
Suite 1700
Raleigh, NC 27601
Tel: 919.306.3319
Fax: 919.839.0304

*Pro Bono Attorney for Plaintiff*