IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Case No. 1:26-cv-02248-APM

JACQUELINE R. SMITH,

Plaintiff,

v.

U.S. DEPARTMENT OF DEFENSE *et al.*,

Defendants.

**PLAINTIFF'S COMBINED REPLY BRIEF IN SUPPORT OF PRELIMINARY INJUNCTION AND RESPONSE IN OPPOSITION TO MOTION TO DISMISS**

Plaintiff Jacqueline R. Smith respectfully submits this memorandum of law as a combined Reply in support of her Motion for Preliminary Injunction and Response in opposition to Defendants' Motion to Dismiss. Defendants' September 9, 2026 memorandum does not defeat Plaintiff's Motion, nor does it require dismissal of Plaintiff's Complaint.

Though the law and facts support her, Plaintiff believes that a hearing permitting brief oral testimony—especially from the former Stars and Stripes Publisher, Max Lederer, whose first-hand knowledge of relevant conversations with the Defendants and whose testimony could neither be assessed nor obtained before the urgent September 24 hearing—will allow the Court to ascertain the facts necessary to the proper resolution of this matter.

Defendants' counter arguments fail for three reasons.

**First**, as demonstrated by the March 9, 2026 "Modernization" Memorandum (the "March 9 Memo"), Defendants did not want Ms. Smith writing anything without their approval, and certainly no op-eds. *See* DE 6-2, at 12–20. Ergo, writing columns for Stripes readers could not have been part of her job description in April 2026, whatever that description was when she was first hired in 2023.

**Second**, even if Ms. Smith's job description included opinion pieces, a proper *Pickering* analysis shows her speech was protected. Defendants' principal argument conflates the subject matter of Ms. Smith's speech with the capacity in which she spoke. Her April 8, 2026 column (the "April 8 Column") addressed the Department of Defense's (the "Department") alleged interference with the editorial independence of *Stars and Stripes* ("Stripes")—the independence that her position as Ombudsman was intended to protect. But Defendants' theory of the case would permit the Government to characterize an unfavorable assessment by an independent oversight official as unprotected speech simply because the assessment also touched on some matters within the official's responsibilities.

That conclusion does not follow from the authorities cited by Defendants. None of *Garcetti*, *Slavin*, *Wilburn*, *Johnson*, or *Trump v. Wilcox* will do the work Defendants desire. The constitutional inquiry in the case at hand cannot be resolved merely by labeling the April 8 column an "ombudsman column." Instead, the crucial question is whether the speech itself, rather than merely its subject matter, was ordinarily within Smith's official duties. *Lane v. Franks*, 573 U.S. 228, 240 (2014); *Garcetti v. Ceballos*, 547 U.S. 410, 421, 424 (2006).

On the record here, there is a substantial distinction between Ms. Smith's responsibility to provide an independent assessment of Stripes' editorial practices and the Government's asserted authority to terminate[1] her because it disagreed with the substance of that assessment.

**Third** and finally, Defendants want to suppress protected speech, though they may couch it as "modernization." That is not an interest the Court can or should respect, and no balancing test of the public's interest will lead to a different conclusion.

## I. THE MARCH 9 MEMO SHOWS THAT DEFENDANTS DID NOT CONSIDER WRITING COLUMNS PART OF THE OMBUDSMAN'S RESPONSIBILITIES.

In their opposing memorandum, Defendants vociferously insist that authoring columns like the April 8 Column were part of Ms. Smith's duties. However, that self-serving assertion is undercut by the March 9 Memo itself.

As an initial point, formal job descriptions are not determinative. *Thompson v. District of Columbia*, 530 F.3d 914, 916 (D.C. Cir. 2008). And yet, Defendants hope to dispose of Ms. Smith's motion and case with a two-page exhibit—the original posting for her position from 2023. *See* DE 12-2. Assuming this document is as important as Defendants hope, it is irrelevant because they changed the job description.

A month before she wrote the April 8 Column and was terminated, Defendants promulgated the March 9 Memo. *E.g.*, Oppo., at 14 (noting that the "Modernization

[1] Defendants now admit (for purposes of their pending motions) that the plaintiff was terminated in retaliation for voicing her concerns in an April 8 Column. Opp., at 8 n.4.

Memo" "identif[ied] job responsibilities for Ombudsman"). The March 9 Memo, included as an exhibit to Ms. Smith's Declaration in support of her Motion, listed the following:

**4. Stripes Ombudsman.**

a. Is a highly qualified news media professional hired from outside of the DoW selected by the ATSW(PA).

b. Advises the Stripes Publisher and DoW leadership on matters relating to Stripes audience interests or concerns and journalistic and editorial practices to aid Stripes in providing a free flow of information relevant to the U.S. military community that cannot be readily obtained from commercial news media sources in accordance with Section 1.a.

c. In coordination with the Stripes Publisher, the ATSW(PA) and the OASW(LA), produces briefings, reports, or other updates for congressional oversight authorities, based on his or her professional media industry experience, regarding the quality, need, and relevance of information provided to the U.S. military community via Stripes in accordance with Section 1.f. The Stripes Ombudsman provides such materials to OASW(LA) for transmittal to Congress.

DE 6-2, at 17–18. This new list of duties clearly states the types of documents the Ombudsman should author—it does not include opinion columns, nor does it include any other form of open communication to the general public. The March 9 Memo also makes clear that the Ombudsman could not speak publicly to Congress until given the approval of the Department's Legislative Affairs Office.

Far from including op-eds and columns, the March 9 Memo expressly prohibits the kind of speech made by Ms. Smith. As stated in paragraph 2.a.(2)(b):

> (b) Stripes may not present its own editorial position, and its personnel may not use Stripes news coverage to advance an editorial position, point of view, or particular interest.

Defendants hope to scuttle Ms. Smith's case based on the purported original job description from 2023 when she first applied. *See* DE 12-2. That argument ignores the March 9 Memo which changed those duties prior to her termination. If job descriptions are determinative, Ms. Smith is entitled to injunctive relief.

## II. DEFENDANTS' *GARCETTI* ARGUMENT IMPROPERLY CONFLATES THE SUBJECT OF MS. SMITH'S SPEECH WITH THE CAPACITY IN WHICH SHE SPOKE.

Assuming Ms. Smith's formal job description on April 8, 2026, included authoring opinion columns, her speech in the April 8 Column was still protected.

Defendants emphasize that Ms. Smith was the Ombudsman and that her position included writing columns concerning journalism and editorial issues. Opp., at 10–13. *Garcetti* requires the Court to determine whether the employee was speaking "pursuant to [her] official duties." 547 U.S. at 421. *Lane* subsequently clarified that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." 573 U.S. at 240. This is a practical inquiry. *Thompson*, 530 F.3d at 916.

### A. <u>The content and context of the April 8 Column show that Ms. Smith spoke as a private citizen.</u>

Ms. Smith was not employed as a Government spokesperson charged with advocating for the Department's policies. She was not a Public Affairs Officer for the

Department. She served as the Ombudsman for Stripes. Her responsibilities included monitoring editorial independence and reporting concerns relating to that independence to Congress, not the readers of Stripes. Opp., at 9–10.

Further underscoring the private nature of the April 8 Column, Ms. Smith did not seek any permission to publish it, its content was not reviewed prior to publication, and nobody at Stripes or the Department asked her to write it. *Cf. Slavin v. Parnell*, No. 1:26-CV-03009 (TNM), 2026 WL 2620990, at *5 (D.D.C. Sept. 4, 2026) (noting that plaintiffs had sought permission to conduct their interviews, suggesting they were speaking in their official capacities).

Ms. Smith also was not speaking to her assigned audiences: Congress and Department leadership. Ms. Smith's job, as made clear in the March 9 Memo, was to communicate concerns to Congress through her new chain of command. Nowhere is the general public mentioned. *Cf. Slavin*, 2026 WL 2620990, at *8 (suggesting that plaintiffs speech might have been protected by the First Amendment if they had authored a "story, op-ed, or breaking headline").

All of these contextual factors show that Ms. Smith spoke as a private citizen, not a Stripes employee.

Defendants' argument is also nonsensical for other reasons. Their theory would convert the Ombudsman's responsibility to identify threats to editorial independence into a responsibility to agree with the Department about whether such a threat existed. But an employee may be assigned to provide independent oversight without forfeiting First Amendment protection for every conclusion reached in performing

that function. Otherwise, the Government could create an oversight position, require the official to evaluate possible interference or wrongdoing, and then characterize any resulting criticism as unprotected speech because it arose from the official's work.

The Government's own description of Ms. Smith's position reinforces this point. Defendants rely on language authorizing columns concerning "readers' concerns about Stripes journalism, editorial integrity, editorial journalism operations, the news organization's mission and general journalistic issues." Opp., at 10–11. That language identifies the subjects of the Ombudsman's work; it does not establish that Ms. Smith was required to adopt the Department's position concerning them. If Smith was responsible for identifying and reporting threats to editorial independence, independent judgment was necessarily part of that function.

Nor do the cases cited by Defendants support their opposition. *See Johnson v. District of Columbia*, 182 F.4th 1052 (D.C. Cir. 2026); *Wilburn v. Robinson*, 480 F.3d 1140 (D.C. Cir. 2007); *Slavin*, 2026 WL 2620990.

*Slavin* does not establish that public-facing speech is unprotected merely because it concerns an employee's work. If anything, *Slavin* stands only for the proposition that employees who speak in media interviews approved by their chain of command while standing in their offices looks like official speech. *See Slavin*, 2026 WL 2620990, at *5–8. Those factors are not present here.

Likewise, *Wilburn* does not support Defendants' position. *Wilburn* involved an employee hired specifically to investigate discrimination who reported discrimination discovered through that investigation. 480 F.3d at 1151. By contrast, the

Ombudsman role was defined in part by an independent assessment of editorial integrity. Her job, to analogize to *Wilburn*, was to report to Congress, not express general concerns to the broader public. The April 8 Column was outside her chain of command.

And *Johnson*, which supports Ms. Smith's requested relief, underscores the importance of examining the capacity in which an employee spoke rather than treating all public-facing speech by a public employee as governmental speech. *Cf. Slavin*, 2026 WL 2620990, at *7 ("Regardless, *Johnson* is inapposite. The correctional officer did not get approval from the prison about her remarks, conduct the interview at the prison, or have a history of conducting interviews about the prison. And, unlike Plaintiffs here, her job duties had nothing to do with public speaking.").

At minimum, these authorities do not justify denying preliminary relief on a categorical incantation of *Garcetti*. The record supports treating the April 8 Column as protected citizen speech or, at minimum, presents a substantial factual dispute that should not be resolved against her prior to discovery.

B. <u>The speech was on a matter of public concern, and the record supports retaliatory causation.</u>

Defendants concede, for the present Motion, that Ms. Smith was terminated for what she said in the April 8 Column and that it touched on a matter of public concern. Oppo., at 8 n.4. That concession is based in fact.

As for causation, Ms. Smith was terminated less than two weeks after the April 8 Column. She never had any performance issues, nor was performance cited as a reason for her termination.

As for a matter of public concern, the April 8 Column discussed the editorial independence of Stripes, the Department's treatment of the newspaper, and the implementation of a modernization initiative affecting its operations. Ms. Smith's column questioned the application of a sourcing strategy that would eliminate comic strips because the comics were provided by a news syndicator disfavored by the President and Department Leadership. Soldiers, Sailors, and Airmen enjoy a good laugh. Applying a policy that resulted in elimination of laughter from Stripes was ill-advised. Ms. Smith, speaking for herself and for those Soldiers, Sailors, and Airmen, said so. She was also flagging a broader trend she saw from Defendants and others in the administration, a widening campaign against a free and independent press.

The Department's treatment of the newspaper and its modernization initiative are subjects that implicate the public's ability to receive independent information concerning military affairs and government policy.

In publishing the April 8 Column, Ms. Smith spoke as a citizen with a particular insight into the operations and *raison de etre* of the publication. That she was also the newspaper's ombudsman matters not to the constitutional issue. As General Dwight D. Eisenhower (later President), famously said—many years ago when resolving a similar dispute over a hard-hitting editorial comic piece by the legendary cartoonist, Bill Mauldin that had irritated General George S. Patton—"Stars & Stripes is the soldiers newspaper. We won't interfere." DE 6-2, Smith Decl. ¶ 7. Ms. Smith's opinion piece was fully consistent with the spirit of General Eisenhower's decision.

## III. IT IS NOT IN THE PUBLIC'S INTEREST TO ALLOW DEFENDANTS' CONSTITUTIONAL VIOLATION TO GO UNREMEDIED.

This clear public interest, foretold by General Eisenhower, is why, at this stage, the *Pickering* balance favors Plaintiff. Defendants identify nothing more than a generalized interest in controlling the direction of Stripes and ensuring support for modernization, but they do not identify any facts demonstrating concrete operational disruption sufficient to justify terminating the official responsible for independently evaluating Stripes' editorial and journalistic integrity.

The balance of equities favors Plaintiff because the harm from continued exclusion is concrete, ongoing, and constitutionally significant, while the government identifies no specific operational harm that would result from temporarily restoring Smith pending resolution of the merits. An injunction would not require the Court to manage Stripes or dictate the content of its journalism. It would prevent Defendants from enforcing an allegedly retaliatory termination while the Court determines whether that termination was lawful.

Defendants' reliance on *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), does not alter that balance. *Wilcox* concerned the President's removal authority over members of an executive agency. It did not hold that the Government may remove an employee for an unconstitutional reason or that ordinary personnel authority defeats a First Amendment claim. The question in Ms. Smith's case is not whether the Executive ordinarily possesses substantial authority over its personnel. It does.

The question here is whether that authority was exercised to punish protected expression. Clearly it was.

The government cannot convert *Wilcox* into a First Amendment immunity cloak simply by describing Smith's removal as an ordinary personnel decision. If that were sufficient, the First Amendment would provide no protection against retaliatory removal whenever the Government could identify an independent personnel interest.

The public interest favors enforcement of constitutional rights. *See Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). The present administration has been testing the limits of Executive authority to terminate employees at various administrative agencies. It is not unfair to say that a trend is developing where the administration is retaliating against government employees who speak out about policy matters in a fashion that the Executive dislikes. *See, e.g.*, *Anthropic PBC v. U.S. Dep't of War*, 825 F. Supp. 3d 1101, 1110 (N.D. Cal. 2026) ("The Department of War's records show that it designated Anthropic as a supply chain risk because of its 'hostile manner through the press.' Punishing Anthropic for bringing public scrutiny to the government's contracting position is classic illegal First Amendment retaliation."). Indeed, targeting disfavored speech is becoming a *modus operandi* for this administration and Defendants. *See, e.g.*, *Kelly v. Hegseth*, 820 F. Supp. 3d 1, 24 (D.D.C. 2026); *N.Y. Times Co. v. Dep't of Def.*, No. CV 26-1690 (PLF), 2026 WL 1872765, at *15 (D.D.C. June 30, 2026); *see also Am. Acad. of Pediatrics v. U.S. Dep't of Health & Hum. Servs.*, 816 F. Supp. 3d 27, 65 (D.D.C. 2026); *Am. Bar Ass'n v. U.S. Dep't of Just.*, 783 F. Supp. 3d 236, 248 (D.D.C. 2025) [hereinafter "*A.B.A.*"]; *Dardarian et al. v. U.S. Dep't of Def. et al.*, Case No. 1:26-CV-1965-CRC (D.D.C.); *Slavin*, 2026 WL 2620990, at *2.

The Government may manage its operations, but managerial authority does not, standing alone, justify suppressing criticism—especially when the criticism is apt. As General Eisenhower well understood, military personnel ought not be so thin-skinned that they can't bear a good laugh.

This Court should act to stop yet another unconstitutional termination.

## IV. THIS IS NOT JUST A CASE ABOUT LOST COMPENSATION—IT IS A CASE ABOUT LOST RIGHTS.

Ms. Smith's constitutional rights were violated. Stripes now lacks an independent monitor to protect its independence. Permitting these wrongs to persist will harm Plaintiff irreparably.

It is well-settled that a continuing violation of First Amendment rights constitutes irreparable injury. *See Elrod V. Burns*, 427 U.S. 347, 373–74 (1976); *Pursuing Am.'s Greatness*, 831 F.3d at 511.

Ms. Smith's injury is not limited to lost compensation. Her termination prevents her from performing the Ombudsman function, communicating with readers, and exercising the professional judgment that the position was intended by Congress to provide. Such injuries are difficult to quantify and cannot necessarily be remedied only with money.

The injury is also time sensitive. Ms. Smith was appointed to serve through December 2026. Each day she remains excluded from the position reduces the remaining period during which she can perform her duties. Once that term expires, later relief may not restore the opportunity to serve or fully remedy the position's public and professional significance.

Defendants' argument that Ms. Smith delayed seeking preliminary relief does not eliminate the continuing injury. Seeking and securing counsel to engage against this government can take time, particularly where counsel is employed *pro bono*. Ms. Smith has pursued her claims through counsel and filed suit before seeking preliminary relief.

The relevant questions are whether the alleged constitutional injury continues and whether delay threatens to make effective relief unavailable. Both considerations support timely relief. The Government itself emphasizes that Smith's term expires in December 2026. Opp., at 14. Without an injunction, the passage of time may substantially reduce the practical value of relief before the Court is able to rule on the merits of her claims. *See Slavin*, 2026 WL 2620990, at *10 (discussing actions of newly appointed, uniformed officer at Stripes and his exhortation to journalists to apologize for sharing their opinions).

## V. THE GOVERNMENT'S MOTION TO DISMISS SHOULD BE DENIED.

Defendants ask the Court not only to deny preliminary relief but also to dismiss the action. That request should be denied. The government's own submission demonstrates that the dispute turns on the practical nature of Ms. Smith's duties, the character of her April 8 Column, the purpose and independence of the Ombudsman function, and the reason for her termination. Those matters cannot be resolved simply by labeling the column "official-duty speech."

At a minimum, Ms. Smith has shown a substantial likelihood that she can establish that the government's characterization of her speech is incomplete and that

her termination was retaliation for protected expression. She has also shown an ongoing constitutional injury, a time- sensitive need for relief, and equities and public interests favoring preservation of the independent oversight function.

Finally, Defendants did not provide any argument regarding Plaintiff's *Bivens* claim against Defendant Parnell in his individual capacity. *Compare* Compl. ¶¶ 90–99, *with* Opposition. The Court should deny Defendants' Motion to Dismiss the *Bivens* claim because their arguments are "perfunctory and undeveloped," and they are thus deemed "waived." *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013).

## VI. CONCLUSION

For these reasons, and for those set forth in Plaintiff's Motion for Preliminary Injunction, Plaintiff respectfully requests that the Court:

1. Hold an in-person evidentiary hearing as scheduled on September 24, 2026 at 2:00 pm;

2. Grant Plaintiff's Motion for Preliminary Injunction;

3. Enjoin Defendants from enforcing Plaintiff's termination from her position as Ombudsman of Stars and Stripes;

4. Direct Defendants to reinstate Plaintiff to that position pending further order of the Court;

5. That, under the circumstances here presented, no bond be required of her for the issuance of the requested preliminary injunction; and

6. Deny Defendants' Motion to Dismiss her complaint.

Respectfully submitted, this, the 16th day of September 2026.

/s/ John Bussian
John Bussian
N.C. State Bar No. 15487
jbussian@aol.com
THE BUSSIAN LAW FIRM PLLC
150 Fayetteville Street
Suite 1700
Raleigh, NC 27601
Tel: 919.306.3319
Fax: 919.839.0304

*Pro Bono Attorney for Plaintiff*